Donald Kenneth FETTERLY,
Petitioner,

v.

Dave PASKETT, Warden of the Idaho State Prison; and Jim Jones, Attorney General, of the State of Idaho, Respondents.

Civ. No. 89–1106.

United States District Court,
D. Idaho.

April 10, 1990.

Van G. Bishop, Nampa, Idaho, Thomas J. McCabe, Boise, Idaho, for petitioner.

Jim Jones, Atty. Gen., State of Idaho, Boise, Idaho, Lynn E. Thomas, Sol. Gen., for respondents.

## MEMORANDUM OPINION

CALLISTER, Senior District Judge.

The Court has before it petitioner's habeas corpus death penalty action. The Court heard oral arguments pertaining to the purely legal issues on March 22, 1990, has reviewed the entire matter, and is prepared to submit its written findings.

The petitioner, Donald Fetterly, was sentenced to death for his conviction of First Degree Murder, Burglary and Grand Theft. At the same time petitioner's co-defendant, Karla Windsor, was also sentenced to death. On appeal the Idaho Supreme Court reversed Karla Windsor's death sentence but affirmed the death sentence given to Donald Fetterly, 109 Idaho 766, 710 P.2d 1202. The Court's primary reason for reversing Windsor's sentence was that she was not the one who actually stabbed the victim. Windsor's case was remanded to The Honorable Edward J. Lodge for resentencing. Judge Lodge truly believed that both Windsor and Fetterly deserved the death penalty, and instead of resentencing Windsor to anything besides death, he disqualified himself. Around this time Fetterly sought post-conviction relief and a reduction of sentence pursuant to Rule 35. This request was premised on the fact that

Judge Lodge felt both defendants were equally guilty, and since the Idaho Supreme Court had overturned Windsor's death penalty, Judge Lodge should in turn reduce Fetterly's sentence. Once Judge Lodge disqualified himself from resentencing Windsor, Fetterly moved for his disqualification maintaining that Judge Lodge could not fairly dispose of petitioner's postconviction request for a new sentence. Judge Lodge denied Fetterly's motion.

In an earlier order and memorandum decision, this Court denied petitioner's request for discovery. The purpose of this hearing was to address the purely legal issues, which the petitioner has coined as follows: (1) The prejudicial pre-trial publicity deprived Fetterly of a fair trial, (2) The unconstitutionally restrictive time limit for seeking postconviction relief in a death penalty action deprived him of due process and equal protection of the law, and (3) Fetterly was unlawfully sentenced to death under the unconstitutional Idaho death statute.

A few days before the murder occurred, Fetterly and Windsor had been arrested and charged for an unrelated theft. Counsel had been appointed and thereafter they were released on bond. The petitioner had become acquainted with the victim, Sterling Gene Grammer, through the petitioner's ex-mother-in-law. On the evening of September 6, 1983, Fetterly and Windsor entered Grammer's residence with the intent to steal his belongings. Because they also wanted to steal the car Grammer was driving, the two remained at his residence until Grammer returned home the next morning. At that time, Fetterly and Windsor taped Grammer's hands and feet. Windsor also applied duct tape to the victim's head, nose and mouth. Thereafter, the victim began to struggle, whereupon Fetterly repeatedly stabbed Grammer in the chest. As the victim was being stabbed, a strange hissing noise emanated from his chest. A pathologist testified that such a noise was caused due to the victim's asphyxiation which was occurring from the taping of his nose and mouth.

Fetterly and Windsor then dumped Grammer's body into the Snake River. On

September 8, 1983, a police officer stopped Fetterly and Windsor for driving at a slow rate of speed. At that time it was discovered they were driving Grammer's automobile. After being provided an explanation by Fetterly, the police officer perceived no problems and allowed Fetterly and Windsor to leave. Then on September 9, 1983, fishermen discovered Grammer's body. The next day police officers once again observed Fetterly and Windsor driving a pickup truck owned by Grammer. This time the two were taken into custody.

Since Fetterly and Windsor were known to have been driving Grammer's car two days earlier, Windsor was questioned as to the location of the car. This questioning occurred prior to the time she was read her Miranda warnings. Windsor gave the police information concerning the whereabouts of Grammer's car, but refused to say anything further until she was given an opportunity to talk to Fetterly. Windsor also indicated that if a statement was to be made, it would be a joint statement from her and Fetterly. Thereafter Windsor and Fetterly were allowed to speak to each other and jointly agreed on making a statement. Prior to this statement, Miranda warnings were read to both parties and they both acknowledged the understanding of their rights under Miranda and executed written wavers *before* making the joint statement. In the statement, the petitioner admitted to the murder of Sterling Grammer.

Petitioner's first argument is that the extensive pre-trial publicity prohibited him from receiving a fair trial. He has submitted lengthy quotes taken from the *Idaho Press–Tribune* as well as *The Idaho Statesman*. These articles, which appeared before petitioner's trial, basically tell all, including: (1) every element of the offense; (2) the petitioner's prior criminal record; (3) the petitioner's recent release from jail on a separate and unrelated charge; (4) the petitioner's confession; (5) the prosecuting attorney's claim that petitioner's confession "nails [him] to the wall." At the trial level, the petitioner requested to change venue, or in the alternative to select jurors outside the area covered by the two newspapers. Judge Lodge denied the motion without prejudice, with the final decision reserved until completion of voir dire. This was to determine whether enough impartial jurors could be found. The petitioner argues that Judge Lodge never even discussed the nature of the coverage when he denied the motion.

The night before the jury selection was to begin, the jury panel had been summoned for the beginning of voir dire. That same day another extensive article appeared in the *Idaho Press–Tribune*. The next morning, the first day of trial, the petitioner's counsel once again moved for change of venue and continuance. The motions were denied, but Judge Lodge did permit separate and individual voir dire of the jurors.

The petitioner avers that Judge Lodge relied upon the "old" concept that "actual prejudice" must be shown through voir dire before a change of venue is warranted. In support of this Fetterly cites to the United States Supreme Court case of *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). In that case, two months before trial, a local television station broadcasted a twenty minute "movie" depicting the interview of the defendant during which he confessed to the crimes he was presently being charged with. The broadcast was aired three times to a total of approximately 106,000 people in a community of 150,000 people. There the Supreme Court found that the broadcast invoked such a probability of prejudice that it was deemed inherently lacking in due process when venue was not changed. Thus, no "actual prejudice" need be shown. Other cases the petitioner relies upon are ones where: (1) two deputies who testified concerning defendant's confession were also in charge of the jury during trial; (2) all pretrial hearings and portions of the trial were televised and broadcast; (3) during the trial, reporters were seated at a press table inside the bar; radio broadcasting was done from a room next to the jury room; private proceedings were overheard and reported by the press; and before trial, jurors' names and addresses were published.

Clearly, all of these examples are far more egregious than the publicity in Fetterly's case.

■ The Ninth Circuit has recently addressed this same issue in *United States v. Rewald*, 889 F.2d 836, 862–64 (9th Cir. 1989). In *Rewald* the Ninth Circuit upheld the trial judge's denial of the defendants motion to change venue without prejudice until after voir dire. This is the precise situation here. The Court opined that a district judge has broad discretion in ruling on a motion for change in venue. *Id.* at 863. A defendant must establish either "presumed prejudice" or "actual prejudice" to warrant a change in venue. *Id.* The Court went on to cite from another Ninth Circuit case for the proposition that: "Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Id.* However, the Court specifically stated that "presumed prejudice" is rarely applicable since it only applies to cases where, "the pretrial publicity was so extensive or the examination of the entire panel revealed such prejudice that a court could not believe the answers of the jurors and would be compelled to find bias or preformed opinion as a matter of law." *Id.* Applying these standards to the publicity prior to petitioner's trial, the Court is completely unable to determine that prejudice should be presumed.[1]

■ This leaves the Court to determine whether or not there was "actual prejudice" on the part of the jurors. In order to fairly and fully evaluate this, the Court has personally read the transcripts of the voir dire of each individual juror who sat for petitioner's trial. The following jurors were selected to hear the evidence in petitioner's case: (1) Carol Trimble, (2) George Puga, (3) Shirley Rau, (4) Carolyn Vermaas, (5) Mary Hennis, (6) Juanita Tabor, (7) Trula Carrow, (8) Earl Wright, (9) Virginia Schroder, (10) Hazel Davenport, (11) David Knoulton, (12) Marjorie Pulley, and

(13) Gloria Gonzalez (Alternate who did not deliberate).

Juror Carol Trimble had heard some facts surrounding the case; however, she had not formed an opinion. (Tr., Vol. 1, pp. 134, 135). In addition, the facts that this juror had heard about prior to trial were facts which were introduced into evidence at trial. Juror George Puga stated that he had not read or heard anything about the case, which was supported by the fact that he did not take the local newspaper. (Tr., Vol. 1, pp. 141, 143). Juror Shirley Rau had read a newspaper article which contained some facts about the case; however, it appears that the facts she could remember were introduced at trial. (Tr., Vol. 1, p. 199). More importantly, Juror Rau reassured the court that she had not formed an opinion as to the defendant's guilt or innocence. (Tr., Vol. 1, p. 199). Juror Carolyn Vermaas had read an article about someone being killed, but did not remember any details. (Tr., Vol. 1, p. 204). She also indicated that she had not formed an opinion. *Id.* Juror Mary Hennis did not take or read the newspaper and knew nothing about the case. (Tr., Vol. 1, p. 68). Juror Juanita Tabor also told the court that she knew nothing about the facts of the case. (Tr., Vol. 1, p. 101). Juror Trula Carrow had heard that the case was going to trial but was not aware of any specific facts. (Tr., Vol. 1, p. 118). Juror Earl Wright scanned over a newspaper article but he could not remember any specific facts. (Tr., Vol. 1, p. 185). Mr. Wright also stated that he had not formed any opinions concerning the defendant's guilt or innocence. (Tr., Vol. 1, p. 185). Juror Virginia Schroder had read that a jury was going to be selected, but knew nothing else about the case. (Tr., Vol. 1, p. 167). Juror Hazel Davenport had heard about the case several months prior to the trial but could not remember any specifics at the time of trial. (Tr., Vol. 1, p. 17). Juror David Knoulton did not know anything about the case. (Tr., Vol. 1, p. 48). Juror Marjorie Pulley knew some facts about the case but stated she had not formed any opinions and could

---

**1.** It is interesting to note that the petitioner waived his tenth preemptory challenge which leads the Court to believe that he was satisfied with the chosen panel.

be impartial. (Tr., Vol., 1, p. 109). Finally, alternate Juror, Gloria Gonzalez, vaguely remembered hearing something about the case but could not remember the specifics. She also had not formed any opinions. (Tr., Vol. 1, p. 216).

The night the jury was selected another newspaper article appeared in the local newspaper. The next day, which was the first day of trial, Judge Lodge asked the jury:

> Ladies and gentlemen, were any of you approached, or did anything happen during the evening recess that would change your ability to sit as a fair and impartial juror in this matter?
>
> No one was confronted with any information, nothing was heard or read in the news media or anything of that nature?

(Tr., Vol. 1, p. 5). All the jurors answered these questions in the negative.

After reviewing the voir dire of the jurors the Court is completely convinced that there was no "actual prejudice" on the part of any juror. This conclusion is supported by the fact that during jury selection Fetterly waived his tenth preemptory challenge indicating his satisfaction with the jury. Furthermore, none of those jurors finally selected were challenged for cause by Fetterly. In sum, the Court does not find any "presumed prejudice" or "actual prejudice" on the part of the jury due to the pre-trial publicity.

The second issue is whether the statutory limitation on the filing of post-conviction petitions in capital cases provided by Idaho Code § 19–2719 is unconstitutional.[2] Section 19–2719 provides in part:

> The following special procedures shall be interpreted to accomplish the purpose of eliminating unnecessary delay in carrying out a valid death sentence.
>
> (3) Within forty-two (42) days of the filing of the judgment imposing the punishment of death, and before the death warrant is filed, the defendant must file any legal or factual challenge to the sentence

or conviction that is known or reasonably should be known.

> (4) Any remedy available by post-conviction procedure, habeas corpus or any other provision of state law must be pursued according to the procedures set forth in this section and within the time limitations of subsection (3) of this section.

The petitioner contends that this section is unconstitutional for five reasons. First, it interferes with the fundamental right of an inmate on death row to access the courts because it requires all post-conviction petitions be filed within 42 days after death judgment. Second, it denies petitioner access to courts guaranteed by article 1, section 18, of the Idaho Constitution. Third, the time limitation violates the equal protection clause in that it treats inmates sentenced to death differently than those not sentenced to death.[3] Fourth, the 42–day limit constitutes an absolute elimination of post-conviction relief since none of the issues traditionally giving rise to post-conviction relief could realistically arise within the 42 days. Fifth, the impact of § 19–2719 deprives the petitioner of effective assistance of counsel.

■ The State asserts that the interference of access to the courts argument was procedurally defaulted since petitioner failed to raise that argument in state court. The Ninth Circuit has embraced the doctrine of procedural default in *Allen v. Risley*, 817 F.2d 68 (9th Cir.1987). The test for procedural default is that if the habeas petitioner is barred from state court relief then he is also barred from federal habeas unless he can show "cause" for and "actual prejudice" from such default, *Citing, Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *See, Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *See also, Roberts v. Arave*, 847 F.2d 528 (9th Cir.1988), or demonstrate that a failure to consider the federal claim will result in a "fundamental

---

**2.** The Idaho Supreme Court has repeatedly rejected this argument.

**3.** Other inmates, excluding those sentenced to death, have up to five years after expiration of time for appeal to file their post-conviction petitions.

**600**

miscarriage of justice." *Murray,* 477 U.S. at 495, 106 S.Ct. at 2649; *see, Harris v. Reed,* 489 U.S. 255, ——, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308, 317 (1989). Thus in order to determine whether or not petitioner's claims are procedurally defaulted, this Court must review the allegations regarding "cause" and "prejudice." In *Murray* the United States Supreme Court opined, "that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray,* 477 U.S. at 488, 106 S.Ct. at 2645.

 In this case the petitioner has failed to advise the Court of any objective factor which impeded his efforts to comply with the state's procedural rule. Although not argued by petitioner's counsel, one recognized "cause" for a procedural default is ineffective assistance of counsel. The Court has sua sponte examined the record in order to determine whether a possible "cause" was ineffective assistance of counsel. This requires the Court to undertake an examination of this case in relation to *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the authority for ineffective assistance of counsel claims. In *Strickland* the court stated that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2064. In this case, the Court must consider the issue of whether the failure of petitioner's counsel to include as an issue of his appeal the claim that Idaho Code § 19–2719 denied him access to the courts, constituted ineffective assistance of counsel. The Court is unable to find such as it believes his counsel more than adequately represented him in his post-conviction proceedings. Furthermore, the Idaho Supreme Court has repeatedly rejected this exact argument in prior cases. Thus the issue would have been summarily dismissed.

 Even though the first and second reasons dealing with the denial of access to the courts issue are dismissed due to a procedural default, the Court feels compelled to alternatively dispose of them on the merits. It is undisputed that there is no federal constitutional requirement that a state provide a means of post-conviction review of state convictions. *Williams v. Missouri,* 640 F.2d 140, 143 (8th Cir.1981), *cert. denied,* 451 U.S. 990, 101 S.Ct. 2328, 68 L.Ed.2d 849 (1981); *Weiland v. Parratt,* 530 F.2d 1284, 1288 (8th Cir.1976), *cert. denied,* 429 U.S. 847, 97 S.Ct. 130, 50 L.Ed.2d 118 (1976). Additionally, courts have found that: "Even where a district court has held a hearing, infirmities in the state's post-conviction remedy procedure cannot serve as a basis for setting aside a valid original conviction." *Williams v. Missouri,* 640 F.2d at 143, *citing, Noble v. Sigler,* 351 F.2d 673, 678 (8th Cir.1965), *cert. denied,* 385 U.S. 853, 87 S.Ct. 98, 17 L.Ed.2d 81 (1966).

Here, the State of Idaho provides prisoners under a death sentence an effective post-conviction opportunity, but only limits the time-frame within which it must be filed. In support of his allegation that this time-frame denies him access to the courts, the petitioner cites the Court to a United States Supreme Court Case, *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). In *Bounds,* the Court opined that state authorities must provide to inmates either assistance of counsel or an adequate legal library for post-conviction proceedings. After reviewing *Bounds,* the Court is of the opinion that it is inapposite to petitioner's case. Here the petitioner was by no means denied access to the courts. The 42–day time-frame is proper given the needs of the state for expediting the sentence.

 The third reason the petitioner maintains that Idaho Code § 19–2719 is unconstitutional is that it violates the equal protection clause of the fourteenth amendment; specifically, that the law treats noncapital prisoners and capital prisoners differently because non-capital prisoners have up to five years to file post-conviction peti-

tions, while capital prisoners have only 42 days. On petitioner's motion for post-conviction relief, the Idaho Supreme Court addressed this particular issue and held that under the "rational basis test" the legislation was constitutionally sound. *Idaho v. Fetterly,* 115 Idaho 231, 766 P.2d 701 (1988), *cert. denied,* — U.S. ——, 109 S.Ct. 3262, 106 L.Ed.2d 607 (1989). The petitioner now maintains that the Idaho Supreme Court erred by not employing the "strict scrutiny" test in its constitutional analysis.

When reviewing an alleged violation of the equal protection clause, the Court will subject the classification to "strict scrutiny" only if the classification operates to the peculiar disadvantage of a suspect class, or interferes with a fundamental right. *United States v. Avendano–Camacho,* 786 F.2d 1392, 1394 (9th Cir.1986). Otherwise, the classification is reviewed under the "rational basis test," which asks whether the classification rationally furthers a legitimate governmental interest. *Id.* at 1394. The Ninth Circuit Court of Appeals has determined that where a prisoner challenges the equal protection of a statute, such is reviewed under the "rational relation test" in order to determine the classification. *Avendano–Camacho,* 786 F.2d at 1394. In addition, in a case similar to the case at bar, the First Circuit Court of Appeals determined that the "rational basis test" is the appropriate standard of review in a habeas corpus action. *Dickerson v. Latessa,* 872 F.2d 1116, 1119 (1st Cir.1989). In *Dickerson,* the court held that:

> Dickerson does not and could not successfully contend that, as a person convicted of first degree murder, he is a member of a suspect class. *See Williams v. Lynaugh,* 814 F.2d 205, 208 (5th Cir.) [sic] (capital defendants not a suspect class for equal protection purposes), *cert. denied,* [484] U.S. [935], 108 S.Ct. 311, 98 L.Ed.2d 270 (1987). The Supreme Court has held that a state is not constitutionally obliged to provide even a direct appeal for a criminal defendant. *Ross v. Moffitt,* 417 U.S. 600, 606, 94 S.Ct. 2437, 2441, 41 L.Ed.2d 341 (1974); *McKane v. Durston,* 153 U.S. 684, 14 S.Ct. 913, 38 L.Ed. 867 (1894).

There can hardly be, therefore, a fundamental right to appellate review of a trial court's post-conviction rulings.

*Dickerson,* 872 F.2d at 1119. After considering the above precedence, along with the fact that petitioner has failed to provide the Court with persuasive authority to the contrary, the Court finds no violation of the equal protection clause.

■ The fourth and fifth reasons supporting petitioner's claim that the post-conviction time-frame is unconstitutional are, respectively, that the 42–day limit constitutes an absolute elimination of post-conviction relief, and that its impact deprives petitioner of effective assistance of counsel. Since neither of these issues were presented to the state courts, they have been procedurally defaulted.

■ In the alternative, the fourth and fifth reasons fail on their merits. The fourth reason is completely erroneous and not supported by *any* case law. As indicated earlier, a state is not required to provide post-conviction review of state court convictions; therefore, it is inconceivable that the petitioner's constitutional rights were violated when he was provided with post-conviction review but only limited as to a time-frame. Likewise, the fifth reason is completely without merit. The petitioner feels that his right to effective assistance of counsel has been interfered with. However, not surprisingly, he fails to cite the Court to any precedent holding such. Even this Court's independent research has not uncovered any authority for petitioner's position. Once again, since the state is not required to provide post-conviction reviews, it is logical that to provide such, even with a limit on the time-frame, does not interfere with the defendant's right to effective counsel.

The Court's analysis of the merits surrounding the alleged unconstitutionality of Idaho Code § 19–2719, convinces it that even assuming that the claims were not barred by the outcome of the "cause" and "prejudice" test, an independent review reveals that no constitutional violation regarding this issue occurred.

■ The third and final issue looks to the constitutionality of Idaho's death sentencing statute. The petitioner maintains that the state's death sentencing scheme violates the sixth, eighth, and fourteenth amendments to the United States Constitution and, article 1, section 7 of the Idaho Constitution. Petitioner relies upon *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir. 1988), *petition for cert. filed*, (U.S. March 20, 1989) (No. 88–1553), for the propositions that: (1) he should have received a trial by jury on the issue of whether or not the death sentence should have been imposed and; (2) the aggravating circumstances delineated in Idaho Code § 19–2515(g)(1)–(10) are unconstitutionally vague.[4]

The Court will first address petitioner's claim that Idaho's scheme for imposing the death penalty is unconstitutional. Petitioner, in support of this contention, relies solely on the Ninth Circuit's decision in *Adamson*. In that case, the court struck down Arizona's death penalty statute as unconstitutional.[5] The court determined that Arizona's statute: "[I]mpermissibly identified elements of the crime of capital murder as sentencing factors for determination by a judge, thereby removing their consideration from a jury, in violation of the Sixth Amendment." *Id.* at 1029. After reviewing past decisions of the United States Supreme Court, the final authority which this Court must follow, the Court is convinced that *Adamson* is not in conformity with the Supreme Court's findings and will therefore not follow *Adamson's* direction.

In *Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), the United States Supreme Court addressed the constitutionality of Florida's statutory scheme for death sentences. The Florida scheme called for the jury to recommend the sentence they thought should be imposed, whereupon the judge would consider that recommendation but was not required

to follow it. In *Spaziano*, the jury recommended life imprisonment but the judge disregarded the recommendation and sentenced the defendant to death. The defendant challenged the sentence as a violation of the fifth, eighth, and fourteenth amendments. The Court stated:

> The sentencer, whether judge or jury, has a constitutional obligation to evaluate the unique circumstances of the individual defendant and the sentencer's decision for life is final.... More important, despite its unique aspects, a capital sentencing proceeding involves the same fundamental issue involved in any other sentencing proceeding—a determination of the appropriate punishment to be imposed on an individual (Citations omitted). The Sixth Amendment never has been thought to guarantee a right to a jury determination of that issue.

*Spaziano*, 468 U.S. at 459, 104 S.Ct. at 3161. The Court went on to opine:

> While it is to be hoped that current procedures have greatly reduced the risk that jury sentencing will result in arbitrary or discriminatory application of the death penalty ... there certainly is nothing in the safeguards necessitated by the Court's recognition of the qualitative difference of the death penalty that requires that the sentence be imposed by a jury.

*Id.* at 460, 104 S.Ct. at 3162. It is evident to this Court that the United States Supreme Court has clearly stated that it is not a violation of a defendant's constitutional rights to be sentenced to death by a judge instead of a jury.

Further, and more recent, support of this Court's findings is found in *Hildwin v. Florida*, 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989). The same sentencing scheme as outlined above in *Spaziano* was challenged in *Hildwin*. In a surprisingly

---

4. The mandate of *Adamson v. Ricketts*, has been stayed while the petition for a writ of certiorari is pending in the United States Supreme Court. In addition, the United States Supreme Court has granted certiorari in *Walton v. Arizona*, — U.S. ——, 110 S.Ct. 49, 107 L.Ed.2d 18 *cert.*

*granted*, (1989) which raises many of the same issues as those in *Adamson v. Ricketts*.

5. Arguably, the Arizona statutory scheme is very similar to the one employed in Idaho. Therefore, the *Adamson* ruling would apply to Idaho.

short decision, the current Supreme Court found that:

> In *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), we rejected the claim that the Sixth Amendment requires a jury trial on the sentencing issue of life or death. In that case, we upheld against Sixth Amendment challenge the trial judge's imposition of a sentence of death notwithstanding that the jury had recommended a sentence of life imprisonment.
>
> Nothing in our opinion in *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), suggests otherwise.... Thus we concluded that the requirement that the findings be made by a judge rather than the jury did not violate the Sixth Amendment right to jury sentencing, even where the sentence turns on specific findings of fact.

*Hildwin,* 490 U.S. at ——, ——, 109 S.Ct. at 2056, 2057, 104 L.Ed.2d at 731, 732.

It is interesting to note that the Ninth Circuit, in *Adamson,* relied upon *McMillan v. Pennsylvania,* to support its finding that aggravating circumstances function as elements of the crime of capital murder which require a jury's determination. *Adamson,* 865 F.2d at 1027. However, in the opinion rendered after *Adamson,* the United States Supreme Court, in *Hildwin,* erased that misnomer by indicating that it did not intend for *McMillan v. Pennsylvania* to be interpreted as the court did in *Adamson. Hildwin,* 490 U.S. at ——, ——, 109 S.Ct. at 2056, 2057, 104 L.Ed.2d at 731, 732.

Finally, in a decision decided March 28, 1990, the United States Supreme Court once again reiterated its support for *Spaziano v. Florida* and *Hildwin v. Florida.* It also cited the case of *Cabana v. Bullock,* 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986) for the proposition that "any argument that the Constitution requires that a jury impose the sentence of death or make the findings prerequisite to imposition of such a sentence has been soundly rejected by prior decisions of this Court." *Chandler Clemons v. Mississippi,* —— U.S. ——, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).

The petitioner further maintains that *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) supports his position. In *Mullaney,* the Court required the prosecution to prove beyond a reasonable doubt the absence of the heat of passion for a sudden provocation in a murder trial. The Court views this case as inapposite to the issues here. Furthermore, it believes *Hildwin* and *Spaziano* are more controlling.

Thus, it is clear that the United States Supreme Court precedent requires this Court to find that Idaho's sentencing scheme which allows a judge to determine whether or not a death sentence should be imposed, is constitutional under the United States Constitution.

The petitioner also maintains that the aggravating circumstances delineated in Idaho Code § 19–2515 are unconstitutionally vague. This issue was also part of the findings in *Adamson.* There the court struck down the Arizona law on the grounds that Arizona's "especially heinous, cruel or depraved" aggravating circumstance violated the eighth and fourteenth amendments.

■■■ Idaho Code § 19–2515(g) provides for a number of statutory aggravating circumstances, at least one of which must be found to exist beyond a reasonable doubt before a death sentence can be imposed. They are as follows:

(1) The defendant was previously convicted of another murder.

(2) At the time the murder was committed the defendant also committed another murder.

(3) The defendant knowingly created a great risk of death to many persons.

(4) The murder was committed for remuneration or the promise of remuneration or the defendant employed another to commit the murder for remuneration or the promise of remuneration.

(5) The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity.

(6) By the murder, or circumstances surrounding its commission, the defen-

dant exhibited utter disregard for human life.

(7) The murder was one defined as murder of the first degree by section 18-4003, Idaho Code, subsections (b), (c), (d), (e) or (f), and it was accompanied with the specific intent to cause the death of a human being.

(8) The defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society.

(9) The murder was committed against a former or present peace officer, executive officer, officer of the court, judicial officer or presecuting [sic] attorney because of the exercise of official duty.

(10) The murder was committed against a witness or potential witness in a criminal or civil legal proceeding because of such proceeding.

In petitioner's case the state trial judge, Edward J. Lodge, found that three aggravating circumstances existed reasonable doubt, namely Nos. 5, 6 and 7 above.[6] (Record, at 242, 243). The petitioner claims that each of the above aggravating circumstances are unconstitutionally vague. Since, only three of the aggravating circumstances were found to exist in petitioner's situation he can only attack those three. He has no constitutional standing to attack the remaining seven aggravating circumstances for vagueness when his death sentence was not entered pursuant to any of them. The Court will address each aggravating circumstance found by Judge Lodge.

■ A state trial judge may find that aggravating circumstance No. 7 is present if the murder was one defined in Idaho Code § 18-4003 and the murder was committed with the specific intent to cause the death. Here, the jury found that the petitioner had committed a murder as defined

by Idaho Code § 18-4003(d), which reads: "Any murder committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, kidnapping or mayhem is murder of the first degree." The jury verdict read as follows: "We, the Jury in the above entitled matter, find the defendant, DONALD KENNETH FETTERLY, guilty of the crime of First Degree Murder, with both premeditation and deliberation *and* in the perpetration or attempt to perpetrate a burglary, as charged by Count I of the Information." (Record, at 161). It is clear that the jury found both elements needed to justify the court's finding as to aggravating circumstance No. 7. In addition, although petitioner maintains that this section is unconstitutionally vague, he has failed to cite the Court to any precedence so holding. The Court, after its own evaluation, believes that the section is surprisingly clear and understandable.

■ The second aggravating circumstance, No. 6, was where the court found that the defendant exhibited "utter disregard for human life." The state trial judge determined that the sixth aggravating circumstance was present because:

The victim was struck in the head with a blow that was severe enough to cause unconsciousness.

The victim was then bound, gagged and rendered helpless and then stabbed repeatedly.

Such conduct manifests such depravity as to offend all standards of morality and human intelligence; was cold blooded and indicative of one whose state of mind was without pity or feeling.

(Record, at 243).

The United States Supreme Court has opined that there is a need for clear standards to guide the court when dealing with death penalty cases. These standards are to prevent courts from applying open-ended construction of terms such as "utter disregard for human life." *Cf. Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d

---

**6.** The Idaho Supreme Court recently addressed this exact issue for aggravating circumstances Nos. 5 and 6 in, *State v. Fain*, 116 Idaho 82, 774 P.2d 252 (1989), *cert. denied,* —— U.S. ——, 110

S.Ct. 277, 107 L.Ed.2d 258 (1989); and *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 287, 107 L.Ed.2d 267 (1989).

859 (1976). This requires the Court to determine if the Idaho courts have provided adequate guidelines to direct the discretion of the sentencing authority. In *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981), the Idaho Supreme Court defined "utter disregard for human life" as being: "[R]eflective of acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for the human life, i.e., the cold-blooded, pitiless slayer." *Id.* at 419, 631 P.2d at 201. The petitioner here alleges that in two recent decisions, *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989), and *State v. Fain*, 116 Idaho 82, 774 P.2d 252 (1989), the Idaho Supreme Court has demonstrated the difficulty in defining and applying the phrase "utter disregard for human life," thus supporting the unconstitutionally vague theory. This Court has reviewed the definition and application of this aggravating circumstance in *State v. Osborn, State v. Charboneau,* and *State v. Fain* and finds that the Idaho Supreme Court has sufficiently defined the phrase so as to direct the discretion of the sentencing court, thus maintaining its constitutional validity.

 Finally, the petitioner challenges aggravating circumstance No. 5 as unconstitutionally vague. That aggravating factor is present if the murder was "especially heinous, atrocious or cruel, manifesting exceptional depravity." The Idaho Supreme Court also defined this phrase in *State v. Osborn.* There the court defined the phrase to mean: "acts setting it apart from the norm of murders and that its commission manifests such depravity as to offend all standards of morality and intelligence...." *Id.* at 418, 631 P.2d at 200. The trial court found the presence of this aggravating circumstance for the following reasons:

The defendant killed a person who had befriended him for a sordid motive;

The knife was used in a malicious manner with at least five different thrusts into the body.

The victim's face was taped so as to cut off air to the victim after his hands

and feet were bound, and he was made helpless.

The killing was for a few earthly possessions whose primary value was their sentiment to the victim.

(Record, at 242).

Given these reasons, as well as the Idaho Supreme Court's definitions, this Court is convinced that the sentencing court's discretion has been sufficiently directed so as to keep the aggravating circumstance constitutionally valid.

In support of his vagueness arguments the petitioner relies primarily upon two cases where similar statutes were struck down as unconstitutionally vague. *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir.1988). The distinguishing factor in each of those cases was that the state courts had not channeled and limited the sentencer's discretion in imposing the death penalty. *Maynard,* 486 U.S. at 364, 108 S.Ct. at 1859–60; *Adamson,* 865 F.2d at 1038. Here, the Idaho Supreme Court has been consistent and narrow with its definitions. In addition, Judge Lodge's findings as to the aggravating circumstances demonstrates that he cited the applicable statutory language as well as the definitions as set forth in *State v. Osborn.* This leads the Court to the inevitable conclusion that none of the applicable aggravating circumstances are unconstitutionally vague.

In sum, there was no "presumed prejudice" or "actual prejudice" on the part of the jury due to the pre-trial publicity; Idaho Code § 19–2719 is constitutional; Idaho's death sentencing scheme is constitutional; and, the aggravating circumstances delineated in Idaho Code § 19–2515 are not unconstitutionally vague.

ORDER

The Court has before it petitioner's habeas corpus death penalty action. In accordance with the views expressed in the memorandum decision accompanying this order,

NOW, THEREFORE, IT IS HEREBY ORDERED that petitioner's habeas corpus death penalty action as pertaining to the

legal issues only be, and the same is hereby, DENIED.